UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LOUIS DREYFUS COMPANY FREIGHT ASIA PTE LTD (f/k/a LOUIS DREYFUS COMMODITIES FREIGHT ASIA PTE LTD), <br><br> Plaintiff, <br><br> v. <br><br> UTTAM GALVA METALLICS LIMITED, and UTTAM GALVA STEELS LIMITED, <br><br> Defendants. | Civil Action No. 17-cv-02476-JSR <br><br> REPLY AFFIDAVIT OF GURSHARN S. SAWHNEY |

I, Gursharn S. Sawhney, a resident of India, do hereby certify, swear, or affirm and declare that I am competent to give this affidavit based upon my personal knowledge unless otherwise stated, and state that the following are true and correct to the best of my knowledge:

1. I am the Director, Finance and CFO of Defendant Uttam Galva Steels Limited ("STEELS"). I make this Reply Affidavit on behalf of STEELS in support of its motion, pursuant to Rule E of the Supplemental Rules For Admiralty or Maritime Claims and Asset Forfeiture Actions of the Federal Rules of Civil Procedure, to vacate the Supplemental Rule B attachment of assets of STEELS' subsidiary, Uttam Galva North America, Inc. ("NA"), under Supplemental Rule E(4)(f) and for dismissal of this action for lack of personal jurisdiction and failure to state a claim. In particular, I make this Affidavit in response to the Supplemental Declaration of Edward W. Floyd dated May 10, 2017 and the exhibits thereto ("Floyd Supplemental Declaration") that have been submitted herein by Plaintiff Louis Dreyfus Company Freight Asia Pte Ltd (f/k/a Louis Dreyfus Commodities Freight Asia Pte Ltd. ("LDCF" or "Plaintiff").



1

2.      My personal knowledge includes knowledge gained from my review of STEELS' books and records, information and documents provided to me by counsel for Uttam Galva Metallics Limited ("METALLICS"), and/or from documents or information conveyed to me from counsel for STEELS or NA, including but not limited to the transcript to the May 8, 2017 deposition of Mr. Rajesh Jain. I incorporate by reference my prior affidavit sworn to on April 27, 2017 and previously submitted in this proceeding.

3.      The Complaint in this action alleges that METALLICS breached two contracts of affreightment (COAs) with LDCF. The merits of those claims will be determined in a foreign arbitration. Plaintiff has attached assets of STEELS (namely, an account payable owed by NA to STEELS) in aid of that foreign arbitration, which attachment was predicated upon the erroneous premise that METALLICS is a mere alter ego of STEELS.

### The Erroneous Identification of the Wrong Mr. Jain Provides No Support for Plaintiff's Alter Ego Allegation

4.      The prior Declaration of Edward W. Floyd dated May 4, 2017 and Plaintiff's May 4 2017 Memorandum of Law sought to support the fallacious allegation that the negotiation of the COAs at issue were "thoroughly under the control of [STEELS]" with the submission of an online biography of a man named Rajesh Jain.

5.      "Rajesh Jain" is not an unusual name in India. The online biography of Rajesh Jain submitted by Plaintiff is not a biography of the Rajesh Jain who works for METALLICS and who was involved in the negotiation of the COAs at issue. Rather, it is a biography of a completely different Rajesh Jain, who formerly worked for STEELS



2

and who had no involvement with METALLICS or with the alleged COAs at issue in the arbitration. Indeed, at his deposition on May 8, 2017, Mr. Rajesh Jain of METALLICS confirmed this fact. (*See* Floyd Supplemental Declaration, Ex. A at 65.) Plaintiff's confusion regarding the two Mr. Jains provides no support for the attachment at issue in this action.

### Copying Messrs. Munjal, Miglani and Agrawal on Email Provides No Support for Plaintiff's Alter Ego Allegation

6. Plaintiff alleges that because three persons that unverified on-line profiles identify as having some connection the STEELS were copied on some emails regarding the alleged COAs at issue, and that one of them attended a settlement conference, METALLICS is a mere alter ego of STEELS, or that additional discovery is required on this issue. Neither argument has merit.

7. During the time period of the COAs, Mr. Rajiv Munjal worked full time as an Executive Director on the Board of non-party Uttam Value Steels Ltd (VALUE), which is a separate, associated company in the Uttam Galva Group. Among other responsibilities, Mr. Munjal monitored the commercial functions of VALUE.

8. Mr. Munjal was copied on communications concerning both alleged COAs at issue in the underlying dispute. (*See* May 4, 2017 Floyd Declaration, Exhibits A and B.) As a general practice, information regarding commercial dealings with outside vendors is often shared among associated companies, as a means of gathering market information, feedback on rate negotiations, and data regarding individual companies. Mr. Munjal was merely copied on these communications, and did not write them, or sign any



3

relevant agreements, and Plaintiff does not allege otherwise. This sharing of commercial information is thus not evidence of the domination of METALLICS by STEELS.

9. Mr. Munjal is an experienced senior executive. Upon information and belief, at the time of the *without prejudice* 2015 settlement meeting between Plaintiff and METALLICS in Singapore, Mr. Munjal was scheduled to be in Singapore on business for VALUE. For administrative convenience, and due to Mr. Munjal's negotiating expertise and experience, Mr. Munjal was expressly authorized by METALLICS management to attend that meeting on behalf of METALLICS, and therefore Plaintiff's allegation does not support any inference that STEELS dominates METALLICS.

10. Mr. Ankit Miglani and M. L. Agrawal were copied on a November 20, 2014 email relating to the second alleged COA at issue in the underlying dispute. (*See* May 4, 2017 Floyd Declaration, Exhibit B.) Plaintiff also points to this as somehow being evidence of dominance and control of METALLICS by STEELS. However, this is not so. As set forth in my prior Affidavit, Mr. Ankit Miglani is a promoter director in METALLICS. He has knowledge of material procurement and is also a director on some other associated companies. Mr. Agrawal attends to commercial functions for STEELS. As with Mr. Munjal, these individuals were copied on this email merely to share market information. Plaintiff does not allege any greater involvement, and this sharing of market information does not demonstrate the domination of METALLICS by STEELS.




4

## The Tripartite Agreements Provide No
## <u>Support for Plaintiff's Alter Ego Allegations</u>

11. LDCF has also submitted a "Deed of Tripartite Payment Assumption and Indemnity" entered into by LDCF, STEELS, and METALLICS, dated February 27 2017 (the "STEELS Tripartite Agreement") in support of its alter ego argument.

12. However, what LDCF also knew, but did not inform the Court, is that LDCF and METALLICS entered into nine similar tripartite agreements, all but one with third parties other than STEELS, in connection with seven out of the eight shipments under the first COA.

13. More particularly, I am informed that these nine tripartite agreements were entered into to facilitate financing arrangements (such as Letters of Credit) between METALLICS and these third parties, to finance the shipments of coking coal that were the subject of the first COA. Because the COA was a bilateral contract between METALLICS and LDCF, the tripartite agreements were all made addenda to the first COA, so that payment could be made by third party entities other than METALLICS to LDCF in connection with the first COA.[1]

14. Thus, METALLICS and LDCF entered into nine similar tripartite agreements, with *six different third party entities (attached as exhibit) other than STEEL*, as financiers, in connection with the eight shipments under the first COA. STEELS was involved in only *one* of these tripartite agreements, in connection with the freight financing of only 35,237 metric tons of coking coal, for one shipment, out of 637,093

---

[1] METALLICS then separately settled with the individual third party financiers, including STEELS, under arm's-length business terms.

5

metric tons shipped in total on the eight shipments made under the first COA, which represents only roughly 5.53% of the total 8 shipments. Again, LDCF was fully aware of each of these nine tripartite agreements with third party financiers, because LDCF was of necessity a party to each such agreement. Therefore, any suggestion in the Supplemental Floyd Declaration that STEELS dominated and controlled METALLICS because it allegedly made payment for all of METALLICS' obligations under first COA is at best erroneous and at worst disingenuous.

15. The other tripartite agreements were made with other third parties:

- Liberty Commodities Limited (London) for Vessel THESSALONIKI

    (*see* Exhibit A hereto);

- Ultimate Logistics Solutions Private Limited for Vessel SEA HERMES

    (*see* Exhibit B hereto);

- Barclays Exports Private Limited for Vessel IKAN BAWAL

    (*see* Exhibit C hereto);

- Kredence Multi Trading Limited for Vessel JAG ARYA

    (*see* Exhibit D hereto);

- Hariyana International PVT LTD for Vessel PEDHOULAS

    COMMANDER (*see* Exhibit E hereto).




- Liberty Commodities ASIA PTE Limited (Singapore) for Vessel PRABHU SHAKTI (*see* Exhibit F hereto );

16. It should also be noted that each of the tripartite agreements, including the STEELS Tripartite Agreement, provides that in the event that that the third party financier fails to make the payments due for the shipment at issue, METALLICS will do so. (*See* Exhibits A-D hereto and Exhibit B to the Supplemental Floyd Declaration at ¶1.2.) Therefore, the guarantee in the tripartite agreements, including the STEELS Tripartite Agreement, was *from* METALLICS on behalf of the third party financiers, not *for* METALLICS by the third party financiers. This, too, argues against any inference that STEELS dominates METALLICS.

### The Kredence Invoice and Bill of Lading Provide No Support for Plaintiff's Alter Ego Allegation

17. LDCF further mischaracterizes other documents it has submitted to bolster its argument that "STEELS and METALLICS treated contractual obligations owed to LDCF as group-level obligations to be interchangeably performed by entities within the group." (*See* Supplemental Floyd Declaration at ¶ 24.)

18. In particular, LDCF points to a freight invoice from LDCF to Kredence and a Bill of Lading in favor of Kredence. (*See* Supplemental Floyd Declaration, Exh. D.) However, rather than being evidence of the treatment by METALLICS of its obligations to LDCF as "group-level obligations," as argued by LDCF, these documents merely and properly follow in connection with the particular tripartite agreement among LCDF, METALLICS and Kredence described above, and the financing of one of the

shipments under the first alleged COA by Kredence.[2] The freight invoice and the Bill of Lading are not indicative of any lack of formality or treatment of METALLICS obligations as being interchangeably performed by other group entities. Rather, they document proper, arm's-length business activities.

### The News Article re State Bank of India Provides No Support for Plaintiff's Alter Ego Allegation

19. The Supplemental Floyd Declaration also attaches as Exhibit E a March 1, 2017 news article from the Economic Times of India (the "Article"). Nothing in this article supports an allegation that METALLICS is an alter ego of STEELS.

20. The Article speculates that a probe had been initiated by a consortium of banks led by the State Bank of India regarding suspected "financial irregularities" at STEELS. However, it should be noted that information sources for the Article are anonymous. Spokespersons for the State Bank of India, STEELS, and Grant Thornton (a forensic auditor appointed by the State Bank of India) all declined to comment when contacted by the Economic Times. Accordingly, none of the information in the Article was confirmed.

21. Indeed, the Article is erroneous in a number of respects, only a few of which are discussed herein, for brevity's sake. No allegations of financial irregularities have been made by the consortium. No "probe" has been ordered. Rather, due to financial stress, STEELS and its lenders are considering the possible inclusion of strategic investors and/or a restructuring of STEELS' debts. Grant Thornton was been

---

[2] The fact that Kredence is associated with STEELS is immaterial. Most of the tripartite agreements were with non-associated parties.

appointed by the consortium of lenders to conduct an audit, which is merely a mandatory prerequisite to any possible debt restructuring. The amounts of the group's loans at issue are also misreported. Finally, as CFO of STEELS, I can confirm that STEELS has adhered to all loan guidelines stipulated by its lenders.

22. Regardless of the foregoing, even on its face, nothing in the Article connects any financial difficulties or transactions of STEELS with METALLICS, or even remotely supports any inference that STEELS dominates and controls METALLICS as an alter ego, as alleged in the Complaint as the basis for the attachment order at issue. In fact, the Article discusses the two companies separately, reports different production capacities, customers, and revenues for each of STEELS and METALLICS, and notes some of the unrelated third party investors in METALLICS (Banyan Tree Investments and Deutsche Investitions- und Entwicklungsgesellschaft).

### Summary

23. As shown above, the Supplemental Floyd Declaration and its attachments do not support Plaintiff's allegation that METALLICS is a mere alter ego of STEELS. The sharing of market information and expertise among related companies and alleged financial difficulties of STEELS do not show domination and control of METALLICS by STEELS, inadequate capitalization of METALLICS, disregard of corporate formalities, absence of discretion, or any of the other factors that I am informed are considered in alter ego analysis. Indeed, as between STEELS and METALLICS, METALLICS is arguably presently the stronger entity financially.



9

24. Moreover, nothing in the Supplemental Floyd Declaration and its attachments militates in favor of directing additional alter ego discovery, or staying any vacatur of the attachment while Plaintiff endeavors to put together an Amended Complaint.

25. Rather, the attachment at issue is causing unwarranted hardship to STEELS, by preventing STEELS from receiving monies due from NA.



10



WHEREFORE, because Plaintiff has not established a reasonable basis - or a prima facie basis - to conclude that METALLICS is a mere alter ego of STEELS, STEELS respectfully requests that its Motion to vacate the attachment and dismiss this action be granted in all respects, along with such other and further relief as the Court deems just and proper.

Executed on: May 12, 2017

_____
GURSHARN S. SAWHNEY

Sworn to before me this
___ day of May, 2017

_____
Notary Public

BEFORE ME
Smmg
12-/5-17

S. M. N. Naqvi
NOTARY
Government of India,
Mumbai & Thane Dist.

SR. No. 1794   P. No. 11
NOTARY Register, 2517 Date 12-5-17