UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
LOUIS DREYFUS COMPANY FREIGHT
ASIA PTE LTD (f/k/a LOUIS DREYFUS
COMMODITIES FREIGHT ASIA PTE LTD),

    Plaintiff,

    -v-

UTTAM GALVA METALLICS LIMITED,
and UTTAM GALVA STEELS LIMITED,

    Defendants.
------------------------------------x

17 Civ. 2476 (JSR)

OPINION



JED S. RAKOFF, U.S.D.J.

On May 16, 2017, this Court vacated an ex parte order of maritime attachment entered against defendant Uttam Galva Steels Limited ("Steels") and in favor of plaintiff Louis Dreyfus Company Freight Asia Pte Ltd ("Louis Dreyfus"). See Order dated May 16, 2017, ECF No. 20. This Opinion explains the reasons for that ruling, and, in particular, joins those district courts that have held that, while an ex parte maritime attachment can be granted solely on the basis of well-pleaded allegations, the attachment, once attacked by the party whose property is attached, cannot continue to be maintained prior to trial unless it is supported by evidence showing reasonable grounds to maintain the attachment.[1]

---

[1] The Court, in the bottom-line order, also dismissed Steels from the action. However, because Louis Dreyfus thereafter timely filed an amended complaint against Steels asserting a new theory

1

Louis Dreyfus instituted this action on April 6, 2017, seeking to attach property in this district belonging to defendants Steels and Uttam Galva Metallics Limited ("Metallics") to obtain security for its breach of contract claims against Metallics that are proceeding in an overseas arbitration. See Complaint, ECF No. 1. On April 12, 2017, upon plaintiff's ex parte application, the Court issued an order of maritime attachment against Steels and Metallics. See Order dated April 12, 2017, ECF No. 8. However, as it turns out, Metallics has no property in this district to attach. Because only Steels' property was attached, Steels alone appeared in this action to protest the order of attachment.

On April 28, 2017, Steels filed the instant motion seeking vacatur of the attachment.[2] On May 4, 2017, Louis Dreyfus opposed the motion.[3] The Court heard oral argument on May 5, 2017, see

---

of liability, see Amended Complaint, ECF No. 21, that dismissal must now be vacated. Whether Louis Dreyfus may obtain a second order of maritime attachment against Steels under its new theory is not currently before the Court.

[2] See Memorandum of Law in Support of Uttam Galva Steels Limited's Motion to Vacate Ex Parte Order of Maritime Attachment and Dismiss Complaint ("Def. Mem."), ECF No. 12; Affidavit of Gursharn S. Sawhney ("Sawhney Aff."), ECF No. 11.

[3] See Memorandum of Law in Opposition to Uttam Galva Steels Limited's Motion to Vacate Ex Parte Order of Maritime Attachment and to Dismiss Complaint ("Plf. Mem."), ECF No. 15; Declaration of Edward W. Floyd ("Floyd Decl."), ECF No. 14.

2

Transcript dated May 5, 2017, ECF No. 22, at which time the Court permitted Louis Dreyfus to take limited discovery and granted the parties an opportunity to submit additional evidence. Louis Dreyfus and Steels made their supplemental filings on May 10 and May 12, 2017, respectively,[4] and, as noted, the Court granted Steels' motion on May 16, 2017.

To defend an ex parte order of attachment that has issued in its favor, the plaintiff has the burden to show that:

> 1) it has a valid prima facie admiralty claim against the defendant; 2) the defendant cannot be found within the district; 3) the defendant's property may be found within the district; and 4) there is no statutory or maritime law bar to the attachment.

ProShipLine, Inc. v. Aspen Infrastructures, Ltd., 585 F.3d 105, 113 (2d Cir. 2009); see also Fed. R. Civ. P. Supp. E(4)(f) ("Whenever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated . . . ."). In this case, there is no dispute that Steels cannot be found in this district, that Steels' property can be found in this district,[5] and that there

---

[4] See Supplemental Declaration of Edward W. Floyd ("Floyd Supp. Decl."), ECF No. 16; Declaration of Lars Forsberg ("Forsberg Decl."), ECF No. 17; Reply Affidavit of Gursharn S. Sawhney ("Sawhney Reply Decl."), ECF No. 18.

[5] In particular, Louis Dreyfus attached an account payable owed to Steels by Steels' New York-based subsidiary Uttam Galva North America, Inc. After the Court vacated the order of attachment,

3

is no statutory or maritime law bar to the attachment. The only dispute is whether Louis Dreyfus has a "valid prima facie admiralty claim" against Steels.

The Second Circuit has not explained in detail how a plaintiff satisfies this element, and district courts are split on whether it is a pleading standard or an evidentiary standard. Compare Ronda Ship Mgmt. Inc. v. Doha Asian Games Organising Comm., 511 F. Supp. 2d 399, 404 (S.D.N.Y. 2007) ("The prima facie standard in the maritime attachment context is a pleading requirement, not an evidentiary standard . . . ."); with Wajilam Exps. (Sing.) Pte. Ltd. v. ATL Shipping Ltd., 475 F. Supp. 2d 275, 278-79 (S.D.N.Y. 2006) ("Supplemental Rule E does not restrict review to the adequacy of the allegations in the complaint. A court also may consider any allegations or evidence offered in the parties' papers or at the post-attachment hearing." (internal quotation marks omitted)). According to one court's count, as of 2008 a majority of courts in this district applied the pleading standard. See Glory Wealth Shipping Serv. Ltd. v. Five Ocean Corp. Ltd., 571 F. Supp. 2d 531, 534 (S.D.N.Y. 2008); see also Ronda Ship Mgmt., 511 F. Supp. 2d at 403 (collecting cases). These courts reason that a pleading

---

the account was paid, and, according to Steels, its only remaining property in this district is its ownership interest in the subsidiary. See Transcript dated June 1, 2017.

4

standard best accords with "the Second Circuit's conception of the Rule B attachment process as a limited inquiry designed to 'be obtained with a minimum of litigation.'" Glory Wealth Shipping, 571 F. Supp. 2d at 534 (quoting Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd., 460 F.3d 434, 443 (2d Cir. 2006), overruled in part on other grounds by Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte. Ltd., 585 F.3d 58 (2d Cir. 2009)).

By contrast, courts in the other camp demand that the plaintiff "demonstrate that reasonable grounds exist for the attachment," a standard that has been likened to the familiar probable cause standard. Wajilam Exps., 475 F. Supp. 2d at 278 (internal quotation marks omitted). The reasonable grounds standard involves "review not only of the adequacy of the allegations in the complaint, but also of any evidence submitted by the parties." Id. at 279. However, "[a]lthough review of extraneous evidence is appropriate, plaintiffs in a Rule E(4)(f) proceeding should not be required to prove their case." Id.; cf. N. of Eng. Protecting & Indem. Ass'n v. M/V NARA, No. Civ. A. 99-0464, 1999 WL 33116416, at *2 (E.D. La. Feb. 26, 1999) ("A rule E(4)(f) hearing is not intended to definitely resolve the dispute between the parties, but only to make a preliminary determination of whether there are reasonable grounds for issuance of the arrest warrant . . . ."). Moreover, while the

5

Second Circuit has not squarely resolved this issue, it has held that a district court does not abuse its discretion in considering evidence beyond the complaint. See Williamson v. Recovery Ltd. P'ship, 542 F.3d 43, 53 (2d Cir. 2008).

After careful consideration of the conflicting authorities, the Court concludes that a plaintiff seeking to defend an ex parte order of maritime attachment entered in its favor must show that reasonable grounds for the attachment exist. An order of attachment can seriously interfere with the garnishee's business and property, and the severity of the remedy demands a more meaningful (though still modest) standard than mere well-pleaded allegations. It is no answer to say, as some courts have suggested, that the Second Circuit has explained that an initial (usually ex parte) order of attachment "may be obtained with a minimum of litigation." See Aqua Stoli, 460 F.3d at 443. That follows from the inherently transitory nature of maritime property; the ship may sail. But after the attachment has been accomplished, this concern no longer applies. At the Rule E(4)(f) hearing, the issue becomes whether an order of attachment obtained on little more than the plaintiff's say-so should be maintained, and it makes little sense to sustain such an order on the same minimal basis as it took to obtain one ex parte. Indeed, courts in this district have long been aware of the "possibility for abusive use of the maritime remedy," see,

e.g., Integrated Container Serv., Inc. v. Starlines Container Shipping, Ltd., 476 F. Supp. 119, 124 (S.D.N.Y. 1979), and limiting review to the face of the complaint might well encourage abusive filings. The Court will, accordingly, apply a modest evidentiary standard of reasonable grounds.

Turning to whether the plaintiff has met this standard, Louis Dreyfus defends the attachment against Steels' property solely under an alter ego theory of liability. There is no dispute that Louis Dreyfus has a valid prima facie admiralty claim against Metallics, against which Louis Dreyfus is arbitrating alleged breaches of two contracts of affreightment ("COAs"); but, as noted, Metallics has no property of its own in this district. The dispute is whether, as Louis Dreyfus alleges, Metallics is Steels' alter ego, such that Louis Dreyfus has a valid admiralty claim against Steels as well.

Lois Dreyfus's alter ego allegations are, in principle, sufficient to support a valid prima facie admiralty claim against Steels. See Pink Goose (Cayman) Ltd. v. Sunway Traders LLC, No. 08-cv-2351 (HB), 2008 WL 4619880, at *2 (S.D.N.Y. Oct. 17, 2008) ("[A]lter-ego theories of liability are prima facie admiralty claims so long as the underlying claim arose in admiralty."); Calchem Corp. v. Activsea USA LLC, No. 06-cv-1585 (CPS), 2007 WL 2127188, at *2 n.10 (E.D.N.Y. July 25, 2007) ("Maritime jurisdiction extends, among other things, to

7

contracts of affreightment . . . . (internal quotation marks omitted)). The issue, therefore, is whether there are reasonable grounds to conclude that Metallics is, in fact, Steels' alter ego.

Under federal common law,[6] veil-piercing is permissible where an entity uses its alter ego "to perpetrate a fraud" and where one entity "so dominate[s] and disregard[s]" its alter ego's corporate form that the controlling entity is primarily transacting its own business through its alter ego. See Williamson, 542 F.3d at 53. Louis Dreyfus concedes that there is no fraud, see Transcript dated May 5, 2017, at 3, and relies instead solely on the argument that Steels dominated Metallics. As the Second Circuit has explained:

> To determine whether an individual so dominated and disregarded a corporate entity's corporate form, a court may consider several factors, including: '(1) the intermingling of corporate and personal funds, (2) undercapitalization of the corporation, and (3) failure to maintain separate books and records or other formal legal requirements for the corporation.' There is no set rule as to how many of these factors must be present to warrant piercing the corporate veil and courts have considered additional factors as well.

---

[6] The parties agree that federal common law applies to Louis Dreyfus's admiralty claim. See Def Mem. at 12-13; Plf. Mem. at 9-10. Because this consent to choice of law is binding, the Court need not itself conduct a choice of law analysis. See Blue Whale Corp. v. Grand China Shipping Dev. Co., 722 F.3d 488, 495-500 (2d Cir. 2013).

Williamson, 542 F.3d at 53 (quoting William Wrigley Jr. Co. v. Waters, 890 F.2d 594, 600 (2d Cir. 1989)). Although framed in terms of an individual's domination of an entity, the same test applies to the question of one entity's domination of another. Notwithstanding this proliferation of factors,[7] the guiding principle is that "liability is imposed when doing so would achieve an equitable result." William Wrigley Jr. Co., 890 F.2d at 601.

Louis Dreyfus has not shown that there are reasonable grounds to conclude that Metallics is Steels' alter ego. To be sure, it is undisputed that Steels and Metallics have significant common ownership and directors, shared office space, and some limited inter-company guarantees. Without more, however, these sorts of factors, while relevant, are insufficient to allow veil-piercing under a domination theory. See, e.g., Williamson, 542 F.3d at 53 (finding insufficient "generalized assertions in the attorney-verified complaint in

---

[7] The parties rely on a non-exhaustive ten-factor test that derives from New York law rather than on the more limited set of factors set forth in Williamson. See MAG Portfolio Consultant, GMBH v. Merlin Biomed Grp. LLC, 268 F.3d 58, 63 (2d Cir. 2001) (applying New York law). However, the difference is immaterial, because courts faced with alter ego questions ultimately analyze much the same kinds of factors regardless of the source of law, the only significant difference being whether a given jurisdiction requires that the domination not only be substantially complete but also be used for a fraudulent purpose (as most, but not all jurisdictions require).

9

this action, unsworn court filings in related actions, and documentation showing common business addresses and management"). And while Louis Dreyfus initially offered some limited evidence arguably showing that Steels disregarded Metallics' corporate form and transacted its own business in Metallics' name, those signs of blurred corporate lines were not borne out by discovery.

It is true that Steels and Metallics are fairly close corporate affiliates. A single investor group, the Miglani family, owns substantial and perhaps controlling stakes in both Steels (31.82%, the highest of any single investor group) and Metallics (50.33%), although neither company owns a stake in the other. See Sawhney Aff. ¶ 5. The Miglani family also acted as "promoters"[8] for both Steels and Metallics. Id. Steels and Metallics share three directors (two of whom are also members of the Miglani family), although that is not a majority of either company's board. Id. ¶ 7. The two companies each have office space in the same building that is owned by non-party Uttam Group. Id. ¶ 9. Both companies are in the metals industry, though they manufacture different end products from different

---

[8] Steels explains, and Louis Dreyfus does not disagree, that under the law of India, a "promoter" is a person or entity involved in a company's registration and flotation of shares to the public. The term does not itself connote dominance or control of the promoted business. See Sawhney Aff. ¶ 5 n.3.

10

raw materials, have different customers and suppliers, and maintain separate plants. Id. ¶ 3. Steels has also guaranteed a small number of Metallics' contracts and other obligations. See id. ¶¶ 14-15; Floyd Supp. Decl. ¶¶ 18-20. One of the guarantees is a tripartite agreement among Louis Dreyfus, Metallics, and Steels in which Steels assumed, in limited part, Metallics' payment obligations under one of the two COAs currently being arbitrated overseas. See Floyd Supp. Decl. ¶ 18 & Ex. C.

However, Louis Dreyfus has submitted no meaningful evidence that Steels transacted any of its own business through Metallics or that Steels and Metallics otherwise lacked corporate separateness, which is the essence of an alter ego claim. The centerpiece of Louis Dreyfus's claim is that an individual named Rajesh Jain, whose email signature in one instance identified him as a "Sr General Manager" for Steels, supposedly negotiated on Metallics' behalf the two COAs between Metallics and Louis Dreyfus that are currently in arbitration. See Floyd Decl. ¶¶ 6-7; id. Ex. B, at 3. An account in the name of Rajesh Jain on the professional networking website brijj.com likewise indicates that Jain is a "SR G.M.-(MARKETING)" for Steels. See id. Ex. C. Because these allegations might arguably support the inference that Steels was transacting its own business through Metallics (a significant factor in a domination analysis, see Williamson,

11

542 F.3d at 53), the Court allowed Louis Dreyfus to depose Jain by telephone. See Transcript dated May 5, 2017, at 18.

No inference of domination survived discovery. According to employment records and Jain's testimony, at the relevant time Jain was employed by Metallics, not Steels. See Forsberg Decl. ¶ 5 & Ex. 3; Deposition of Rajesh Jain ("Jain Dep."), Ex. A to Floyd Supp. Decl., at 13-15. Jain, who had formerly been employed by Steels, testified that he had manually typed "Steels" rather than "Metallics" in his email signature by mistake, see Jain Dep. at 26, 33-34, which is consistent with the fact that the signature only appears in one email message in one of the two email chains at issue, see Ex. B to Floyd Decl., at 3. The brijj.com profile discussed supra turns out to belong to a different Rajesh Jain (not an uncommon name in India) who worked for Steels, and not the Rajesh Jain employed by Metallics who negotiated the two COAs. See Sawhney Reply Aff. ¶¶ 4-5; Jain Dep. at 37, 40-41. In short, Louis Dreyfus's evidence amounts to nothing more than careless typing and mistaken identity. It is apparent that Steels was not transacting its own business through Metallics; rather, Metallics was properly transacting its own business in his own name.

Louis Dreyfus's remaining evidence of domination does not even rise to the level of the mistaken Jain email signature. Louis Dreyfus places great weight on the fact that several other

12

individuals who might be affiliated with Steels were copied on the two email chains in question, see, e.g., Exs. B, F to Floyd Decl., but that cannot overcome the simple fact that the emails show Metallics negotiating on its own behalf. Nor can the unremarkable fact that Metallics tapped Rajiv Munjal, an employee of neither Steels nor Metallics but another corporate affiliate entirely, to represent Metallics at a settlement conference. See Floyd Decl. ¶¶ 4-5; Sawhney Reply Aff. ¶¶ 7-9.

Steels' contractual assumption of a modest fraction of Metallics' payment obligation under one of the two COAs likewise does not suggest domination. See Floyd Supp. Decl. ¶ 18. Louis Dreyfus's reliance on this tripartite agreement is particularly dubious because Louis Dreyfus is a party, not only to that particular contract, but also to eight similar contracts in which companies other than Steels guaranteed Metallics' payment obligations to Louis Dreyfus. See Sawhney Reply Aff. ¶¶ 11-16. Nor is there anything suspect about this arrangement. Each contract merely represents one half of a financing arrangement in which a guarantor advances payment on Metallics' behalf, and Metallics and the guarantor separately settle. Much more is required to pierce the corporate veil. Cf. Wajilam Exports, 475 F. Supp. 2d at 283-84 (sustaining maritime attachment order where "funds payable to ATL-BVI (and, for that matter, ATL-

13

Shanghai) are routinely diverted to [defendant] in disregard of the companies' separate forms").

In sum, Louis Dreyfus has failed to show reasonable grounds to conclude that Metallics is Steels' alter ego. At most, Louis Dreyfus has shown that Metallics and Steels have some common ownership, directors, and personnel, and operate in related industries, all of which is insufficient to show domination. Indeed, "[w]ere allegations such as these adequate to support an attachment, the property of corporations in any way sharing common ownership with a party to a maritime dispute would routinely be interfered with, without any likelihood that the party would ultimately be found liable in the underlying dispute." Kola Shipping Ltd. v. Shakti Bhog Foods Ltd., No. 08-cv-8817 (GEL), 2009 WL 464202, at *2 (S.D.N.Y. Feb. 24, 2009).

Accordingly, for the foregoing reasons, the Court, on May 16, 2017, vacated the ex parte order of maritime attachment entered against Steels.

Dated:   New York, NY
         June 25, 2017

_____
JED S. RAKOFF, U.S.D.J.